State of Illinois )
                        ) ss
County of St. Clair )

## UNSWORN DECLARATION UNDER PENALTY OF PERJURY
## IN SUPPORT OF COMPLAINT FOR FORFEITURE

I, Adam Hoberg, declare under penalty of perjury the following:

At all relevant times, I have been a Special Agent (SA) with the Federal Bureau of Investigation (FBI). The contents of this Declaration are based on information provided to me during the course of my investigation into Emmitt T. TINER from participants in the criminal activity, from other witnesses, and from other law enforcement officers, including agents with the Federal Bureau of Investigation ("FBI"), the Internal Revenue Service – Criminal Investigation ("IRS-CI"), the Department of Health and Human Services – Office of the Inspector General ("HHS-OIG"), the Social Security Administration – Office of the Inspector General ("SSA-OIG"), and the Illinois State Police ("ISP").

## HEALTH CARE FRAUD

1. The Illinois Department of Human Services ("IDHS") operates a program known as the Home Services Program. This program provides services to low income individuals with severe disabilities so that they can remain in their homes and remain as independent as possible. One of the Homes Services Programs is known as the Personal Assistant program. Personal Assistants provide assistance with household tasks and personal care. Personal Assistants are typically selected and supervised by the disabled person.

2. Funding for the Illinois Home Services Program, including the Personal Assistant program, is partly provided by the federal government, through the United States Department of Health and Human Services ("HHS"). The program is jointly funded, with one half paid by HHS

and the other half paid by the State of Illinois. The Illinois Home Services Program is a health care benefit program, as defined by Title 18, United States Code, Section 24(b).

3. The Illinois Personal Assistant program has certain financial eligibility criteria. To be eligible, applicants who are single cannot have more than $17,500 in assets, excluding their personal residence and one vehicle. Married applicants are not entitled to have more than $35,000 in assets, again excluding their residence and one vehicle.

4. Each year, applicants/recipients of Personal Assistant benefits are required to sign a Home Services Program Financial Data Sheet. On this form, the applicants/recipients are required to list their assets, including savings accounts, checking accounts, and cash on hand. In addition, applicants/recipients are required to certify whether they have transferred assets to another party within 36 months preceding their application.

5. Each year, a Rehabilitation Counselor with IDHS performs an assessment of each applicant/recipient. During this assessment, the counselor determines the level of assistance that the applicant/recipient requires in performing his or her household tasks and providing for his or her personal care. This assessment then determines the number of Personal Assistant hours for which IDHS will pay.

6. TINER submitted an application for the Illinois Personal Assistant program in 2010 and began receiving Personal Assistant benefits in 2012. TINER participated in the program until he was terminated in November 2019. On each one of the Financial Data Sheets he signed, TINER reported that he had less than $17,500 in assets. In addition, TINER reported on each of these forms that he had not transferred any assets to another party within the preceding 36 months.

7. During a conversation with TINER on August 22, 2019, an IDHS Rehabilitation Counselor learned that TINER had recently purchased a home at 210 Knollhaven Trail in O'Fallon,

Illinois. IDHS Rehabilitation Counselor later learned that TINER had recently purchased another property in O'Fallon, Illinois and was building a home on that property.

8. Evidence developed to date indicates that TINER made false statements regarding his assets on the Financial Data Sheets. For example, TINER did not report his possession or transfer of the large stacks of $100 bills he is seen holding in a photo from the spring of 2016. In addition, on November 17, 2016, TINER was awarded $625,000 for an injury allegedly sustained while he was in the Illinois Department of Corrections. TINER did not report his possession or transfer of these funds on the Financial Data Sheets he signed.

9. Evidence developed to date also indicates that TINER made false statements to IDHS regarding the extent of his disability. The annual assessments of TINER conducted by an IDHS Rehabilitation Counsellor. The IDHS Rehabilitation Counselor reported that during most of these assessments, TINER reported that he was unable to stand or walk, except when transferring himself from his bed to his wheelchair. Numerous other witnesses, however, have reported seeing TINER standing and walking during the time period that he received Personal Assistant benefits.

10. On October 1, 2020, federal agents working on this investigation interviewed K.G. K.G. was listed as TINER's Personal Assistant from January 2013 to May 2016. K.G. told the agents that TINER is not disabled and does not require a Personal Assistant. K.G. stated that TINER convinced her to sign up to be his Personal Assistant by promising to split with her the monies she received from the Illinois Personal Assistant Program. K.G. also told the agents that TINER illegally provided narcotics to her, including Vicodin and Percocet.

11. From May 2016 until January 2019, TINER's Personal Assistant was Matissia Holt. At various times, TINER has referred to Holt as both his girlfriend and his wife. Based upon

information developed during the investigation, it appears that TINER and Holt did, in fact, get married.

## WIRE FRAUD AND THREATS
## INVOLVING COOPERATING WITNESS

12. A cooperating witness ("CW") has provided information to the FBI regarding his dealings with TINER. The CW met TINER in either 2016 or early 2017 while both were gambling at casinos in the St. Louis area. The CW resides in Missouri and owns a small business in Missouri. Sometime after they met, TINER asked the CW to loan him money. From June 2017 through November 2017, the CW loaned TINER approximately $85,000. TINER prepared and signed notes acknowledging these loans. TINER told the C.W. that he would repay the money he borrowed from one of two sources: (1) the proceeds of a personal injury lawsuit he was pursuing against the State of Illinois; or (2) the monies he would receive as the beneficiary of a life insurance policy. After a period of time passed, CW asked TINER to repay him. TINER responded that he intended get the money to repay CW by illegally selling certain prescription pain medications and/or narcotics. As time went on TINER attempted to falsely convince CW that CW was involved in TINER's illegal drug transactions and that CW owed additional money that was needed to pay certain individuals who were involved in these drug trafficking activities.

13. When CW started refusing to provide additional money to TINER, TINER made oral threats and also sent threatening text messages to CW. Examples of the threats made by TINER include: (1) a text sent on September 16, 2017, in which TINER tells CW that he knows his address, as well as the name and address of CW's daughter; (2) another text sent on September 16, 2017, in which TINER told CW: "If you want to do the right thing . . . . make THIS right . . . and calm the murderous rage I have growing inside GIVE ME MY MONEY BACK!!!"; (3) a text sent on September 20, 2017, in which TINER told CW: "[I]f you say sometime (sic) to piss me

off . . . all loyalty is out the window and ill (sic) come find you and end you . . . ."; (4) October 2, 2017, TINER sent a communication in interstate commerce with the intent to extort CW, namely a text sent from St. Clair County, Illinois, to Missouri, in which TINER told CW: "If you do not give me my money back i gave you in my account and we lose all that money . . . . anybody related to you … work with you . . . friends with you . . . lives with you . . . knows you . . . etc will pay the consequences of you fucking me . . . . then and only then when they think you have experienced enough loss and pain will they look for you!!!!!"; and (5) a text sent on October 6, 2017, which forwards a screen capture of a news story showing a police car with a story banner stating "Driver flips car after being shot," followed by a text in which TINER tells CW: "Heres (sic) a lil hint for you!!!!.... and remember our talk keep your mouth quiet!!!"

14. The CW lives in Missouri. He was located in Missouri when he received the text messages from TINER described in the preceding paragraph. TINER was known to be living in Illinois at the time the text messages were sent. He sent the text messages from a phone bearing a "618" area code. The CW received these text messages on a phone bearing a "314" area code.

## AGGRAVATED IDENTITY THEFT

15. Evidence developed to date shows that TINER routinely uses a social security number ("SSN") that belongs to another person. TINER's actual SSN ("SSN") ends with last four digits of "3303." For purposes of reporting gambling winnings on Currency Transaction Reports ("CTRs"), TINER often provides a social security number that is identical to his real SSN, except that the SSN TINER provides to the casino ends with the digits "3304." TINER is known to have provided the "3304" to the following casinos in the following years: (1) 2011 – 1 CTR filed by Ameristar casino in St. Charles, Missouri; (2) 2015 – 1 CTR filed by Rhythm City Casino in Davenport, Iowa; and (3) 2016 – 10 CTRs filed by Ameristar Casino in East Chicago, Indiana.

16. This social security number used by Tiner which ends in "3304" belongs to D.L. of Deltona, Florida.

17. During his dealings with Herman's Pawn Shop in Collinsville, TINER provided a SSN that was identical to his own, except that the SSN TINER provided to Herman's Pawn Shop ended with the last four digits "3353." This social security number used by TINER which ends in "3353" belongs to C.B. of Arlington Heights, Illinois. TINER's use of the "3353" was in relation to felony violations specified in Title 18, United States Code, Section 1028A(c)(11), including a violation of Title 42, United States Code, Section 408(a)(7)(B). Specifically, TINER knowingly, willfully, and with the intent to deceive falsely represented his social security number for the purpose of concealing his currency transactions from the Internal Revenue Service.

18. Among other reasons, it is believed that TINER alters his social security number by one digit in order to prevent discovery of his assets and to thwart Kane County, Illinois, from collecting the $107,500 in restitution he owes to the victim in that jurisdiction.

19. It is also believed that TINER used other persons social security numbers in order to further hide his assets from the Illinois Personal Assistant Program. Specifically, if the Illinois Personal Assistant Program had discovered that TINER was gambling with amounts of cash that exceeded the $17,500 threshold, he would not have qualified for benefits under the program.

**EXTORTION/ MAIL FRAUD**

20. On August 19, 2020, R.G. was interviewed at the FBI Springfield Field Office-Fairview Heights Resident Agency. Present during the interview were FBI Special Agents (SA) Charles Willenborg and SA Julie Neiger. In addition, R.G.'s close friend Steve Wigginton came with R.G. to the meeting. During this interview R.G. provided the following information:

21. Approximately two years ago, TINER approached R.G. and accused R.G. of having an affair. R.G. told the agents that he did not have an affair; however, R.G. acknowledged that he knew the female TINER's was referring to and that the female had a boyfriend that started "giving [her] a hard time." TINER asked if R.G. wanted TINER "to take care of the situation" in exchange for money. R.G. told TINER he did not want this boyfriend harmed and did not want TINER to get involved.

22. After R.G. said he did not want the boyfriend harmed, TINER called and texted R.G. threatening to expose R.G.'s alleged affair. Specifically, TINER threatened to turn this information over to R.G.'s wife.

23. About one month later, R.G. agreed to meet TINER. During that meeting, TINER told R.G. he would turn the alleged information about the affair over to R.G.'s wife unless R.G. gave him money. A few days later, R.G. gave TINER a cashier's check for approximately $225,000 in an attempt to make him go away. R.G. made the check payable to Matissia Holt.

24. After this first payment to TINER, R.G. began receiving additional calls and text messages from TINER demanding more money. Once again, TINER threatened to disclose the fabricated affair to R.G.'s wife if R.G. did not pay him. Around May of 2019, R.G. again met with TINER and gave him approximately $225,000 again.

25. After the first couple payments, TINER changed the way he extorted money from R.G. TINER said his "crew" broke into a home in Collinsville, Illinois, in order to recover evidence of the affair. TINER further claimed that while his crew was inside this residence, things went wrong and his crew murdered several individuals who were present in the house during the break-in. TINER then claimed that he and his crew went to Las Vegas, Nevada and buried three dead bodies. TINER told R.G. he paid the crew $700,000 to do this. Now, according to TINER,

R.G. owed TINER $700,000.  TINER then threatened that he would turn the murder evidence over to the Las Vegas Police if R.G. did not continue to pay him.

26. In an effort to trick R.G. into continuing to provide extortion payments to him, TINER prepared and sent to R.G. several staged, fraudulent video recordings.  These video recordings purport to show that TINER has evidence of R.G.'s involvement in the murders of the individuals who were buried in Las Vegas, and that TINER is on the verge of turning this evidence over to the authorities.

27. In June 2020, R.G. and his attorney met with TINER.  At this meeting, R.G. told TINER he had no more money.

28. On September 10, 2020, TINER sent two envelopes via United States Postal Service Certified Mail.  One envelope was addressed to R.G. and the second envelope was addressed to R.G.'s wife.  The contents of these envelopes were identical.  The envelopes were delivered on September 12, 2020.  Both envelopes contained one-page letters addressed to R.G.  The letter states: "Due to your blatant lies I have contacted Preston Humphreys who heads the Federal Defenders Office."  TINER then threatens to turn over the evidence he possesses to the U.S. Attorney if R.G. does not pay him more money.

29. On September 3, 2020, IRS SA Brad Roessler interviewed R.G. regarding ongoing communication with TINER.  R.G. stated he has received three or four calls from TINER.  In addition, TINER stopped by R.G.'s place of business and spoke with R.G.'s manager on September 2, 2020.  The video of this visit was downloaded from the business DVR onto a thumb drive and dropped off at the FBI - Fairview Heights Office.  The video showed TINER arrive in a burgundy red 2020 Ford F350 Crew Cab XLT.  This vehicle is further identified as having a vehicle identification number (VIN) of 1FT8W3B64LEC41202.

30. On October 9, 2020, R.G. was interviewed by SA Roessler and asked what vehicles he has seen TINER driving when meeting with R.G. to discuss and make payments related to the extortion. R.G. stated that TINER has met him while driving a light red Cadillac Escalade and a burgundy red Pickup truck that TINER currently owns. No other vehicles were discussed with R.G. Based on the investigator's involvement in this investigation, investigators believe the burgundy red Pickup Truck that R.G. referred to is the 2020 Ford F350 Crew Cab XLT.

## **MONEY LAUNDERING**

31. TINER caused proceeds of his fraudulent and extortionate activities to be deposited into bank accounts in the name of Matissia S. Holt for purposes of concealing the location, source, ownership, and control of those funds. In addition, TINER knowingly engaged in monetary transactions in the Southern District of Illinois in property of a value greater than $10,000 that was derived from his fraudulent and extortionate activities.

32. As noted above, Matissia Holt is TINER's wife. Since 2016, Holt has served as TINER's PA under the IDHS's Personal Assistant program.

33. On September 11, 2020, I received records from Providence Bank. These records show that between January 2019 and November 2019, R.G. purchased cashier's checks totaling $439,000. All of these cashier's checks were made payable to Matissia Holt.

34. On September 17, 2020, I received records from Commerce Bank. These records show that between January 2019 and November 2019, R.G. purchased cashier's checks purchases totaling $463,000. All of these cashier's checks were made payable to Matissia Holt.

35. On September 23, 2020, I received records from Regions Bank for bank accounts associated with Matissia Holt. These records show that between August 2019 and November 2019, cashier's checks purchased at First Collinsville Bank, totaling $725,000, purchased by R.G.,

were deposited into Holt's Regions Bank account. All of these cashier's checks were made payable to Matissia Holt.

36. Records received during the investigation show that TINER engaged in at least three monetary transactions involving $10,000 or more of the funds he took from R.G. by means of fraud and extortion.

37. On December 13, 2018, a cashier's check purchased by R.G. in the amount of $160,000, payable to Matissia Holt, was deposited into an account in Holt's name at U.S. Bank. Additional cash deposits were made into that U.S. Bank account on the following dates: (1) 12/31/2018 – $20,000; (2) 01/02/2019 – $40,000; (3) 01/03/2019 – $30,000; (4) 01/14/2019 – $23,840; (5) 01/15/2019 – $20,000; (6) 01/15/2019 – $29,000; and (7) 01/16/2019 – $29,000.

38. On January 2, 2019, $220,008 was withdrawn from the U.S. Bank account in Holt's name. On January 17, 2019, an additional $129,000 was withdrawn from that account. Those funds were combined with an additional $249,000 and disbursed in the form of a U.S. Bank cashier's check payable to Holt for $369,000.

39. On January 30, 2019, the $369,000 U.S. Bank cashier's check was deposited into an account in the name of Matissia Holt at Associated Bank. In addition to the $369,000, the following cashier's checks, purchased by R.G., payable to Holt, were deposited into the Associated Bank account on the following dates: (1) 01/30/2019 – $110,000; (2) 02/07/2019 – $50,000; and (3) 02/07/2019 – $25,000. A cash deposit of $1,500 was also made to the account.

40. On February 8, 2019, a wire transfer in the amount of $366,991.91 was disbursed from the Associated Bank account to First American Title Insurance Company. Other records obtained during the investigation show that a residence located at 210 Knollhaven in O'Fallon, Illinois, was purchased on January 29, 2019, for $365,000 in cash. The name of the purchaser

shown on the deed for this transaction is Matissia Holt. TINER's name does not appear on the deed for this property.

41. Other evidence demonstrates that 210 Knollhaven in O'Fallon, Illinois, is actually TINER's property. For example, on August 22, 2020, TINER told an IDHS Rehabilitation Counsellor that he had recently purchased a home located at 210 Knollhaven Trail in O'Fallon.

42. On February 15, 2019, another cashier's check purchased by R.G., in the amount of $111,000, payable to Matissia Holt, was deposited into the Associated Bank account. A cash deposit of $20,000, and two deposits totaling less than $2,000, were also made to the account.

43. On February 19, 2019, check number 1002, in the amount of $39,319.95, payable to Jack Schmitt Cadillac, was paid from the Holt account at Associated Bank. Records received from John Schmitt, previously identified as Jack Schmitt Cadillac, O'Fallon, Illinois, show that on February 14, 2019, Emmitt T. TINER and Matissia S. Holt purchased a 2019 Cadillac Escalade bearing vehicle identification number (VIN) of 1GYS4KKJ7KR254957. The records further show that the purchase price of the vehicle was $104,319.95, and that Holt and TINER paid for the vehicle with $65,000 cash down and a check in the amount of $39,319.95 written out of Holt's Associated Bank account.

44. Subsequently, the following additional cashier's checks, purchased by R.G., payable to Matissia Holt, were deposited into Holt's Associated Bank account: (1) 03/05/2019 – $111,000; (2) 03/19/2019 – $111,000; (3) 04/03/2019 – $118,000; (4) 04/03/2019 – $42,000; (5) 04/03/2019 – $42,000; (6) 05/01/2019 – $100,000; (7) 05/01/2019 – $75,000; (8) 05/01/2019 – $75,000; (9) 05/28/2019 – $100,000; (10) 05/28/2019 – $75,000; and (11) 05/28/2019 – $75,000. During this time additional deposits totaling approximately $7,300 were also made to the account.

45. On June 7, 2019, a wire transfer in the amount of $160,290.61 was disbursed from the Associated Bank account to First American Title Insurance Company. Other records obtained during the investigation show that a vacant lot located at 1405 Pausch Road in O'Fallon, Illinois, was purchased on June 10, 2019, for $160,000 in cash. The name of the purchaser shown on the deed for this transaction is Matissia Holt. TINER's name does not appear on the deed for this property.

46. On August 19, 2019, $35,678.05 was disbursed from the Associated Bank account in the form of a cashier's check payable to Matissia Holt. This cashier's check was deposited into an account number account 2218198 in the name Matissia Holt at Scott Credit Union. The account was set up with a shared savings account and a checking account. Of the $35,678.05 deposit amount, $5,005 was deposited into the shared savings account portion and $30,673.05 was deposited into checking account portion.

47. On August 15, 2019, a $300,000 cashier's check purchased by R.G., payable to Matissia Holt, was deposited into account number 286854577 in Holt's name at Regions Bank. Subsequently, additional cashier's checks purchased by R.G. were deposited into the Regions account on the following dates: (1) 10/22/2019 – $375,000; (2) 12/02/2019 – $50,000; (3) 12/02/2019 – $25,000; and (4) 12/02/2019 – $25,000. Cash deposits were also made into the account on the following dates: (1) 10/10/2019 – $9,000; (2) 01/02/2020 – $40,000; (3) 01/07/2020 – $49,500; (4) 01/08/2020 – $47,200; (5) 01/09/2020 – $48,040. During this same period, other deposits totaling approximately $5,600 were made to the account.

48. On December 18, 2019, Emmitt T. TINER and Matissia S. Holt traded in a 2016 Chevrolet Silverado to Auffenberg Ford North, Inc. in O'Fallon, Illinois for a burgundy red 2020 Ford F350 Crew Cab XLT bearing vehicle identification number (VIN) of

1FT8W3B64LEC41202.  The investigation revealed that TINER and Holt received a trade in allowance of $40,000 for the 2016 Chevrolet Silverado and paid an additional $26,000 in cash to complete the purchase of the 2020 Ford F350 Crew Cab XLT.

49.     On January 23, 2020, a check for $339,351.51, from the Law Offices of Johnson, Johnson & Nolan, payable to Matissia Holt, was deposited into the Region's account.  Based upon other records obtained during the investigation, it appears that these funds represent TINER's share of the settlement from the litigation over the proceeds of a life insurance policy.

50.     On March 20, 2020, $225,869.16 was withdrawn from the Holt account at Regions Bank and disbursed in the form of a cashier's check payable to Town & Country Title.  A representative of Town & Country Title informed me that these funds were placed into an escrow account and used to pay construction costs for the residence being built at 1405 Pausch Road in O'Fallon, Illinois.  Other large checks written from the Regions account also appear to be related to construction of the Pausch Road residence.  These checks include:  (1) 02/28-2020 – $15,367.00 – Flawless Foundations; (2) 05/27/2020 – $12,120.81 – Menards; (3) 06/01/2020 – $2,813.59 – RP Lumber; (4) 06/03/2020 – $29,825.65 – Menards "Cabinets Kitchen"; (5) 06/08/2020 – $2,600 – Innovative Cons Concepts; (6) 06/17/2020 – $33,000 – Headen Electric; (7) 06/22/2020 -- $20,000 – DMI Plumbing; and (8) 08/18/2020 – $40,000 – Germann Brick Contractor "Brick on House."

51.     The following cash withdrawals were also made from the Holt account at Regions: (1) 10/21/2019 – $ 3,000; (2) 10/22/2019 – $1,000; (3) 10/24/2019 – $2,000; (4) 01/22/2020 – $2,000; (5) 01/31/2020 – $1,000; (6) 02/05/2020 – $200,000; (7) 02/20/2020 – $1,000; (8) 02/26/2020 – $250,000; (9) 03/13/2020 – $10,000; (10) 03/16/2020 – $1,000; (11) 06/15/2020 – $600; (12) 07/01/2020 – $200,000; (13) 07/06/2020 – $808.99; (14) 08/06/2020 – $120,000; and

(15) 08/19/2020 – $800.  Numerous other withdrawals from the account appear to be for gambling expenses and/or trip(s) to Las Vegas, Nevada.

## PURCHASE OF 1962 CHEVROLET IMPALA

52. In early January 2019, Emmitt TINER and Matissia Holt visited the showroom at Gateway Classic Cars in O'Fallon, Illinois.  TINER and Holt spoke with a salesperson and expressed interest in various vehicles.  A few days after the initial visit, TINER returned and asked questions about the purchasing process.  At one point, TINER mentioned someone else completing the purchase for him.

53. On January 29, 2019, TINER returned to the showroom and indicated that he wanted to do a cash transaction and was informed that an IRS Form 8300 (Report of Cash Payments over $10,000 to a Business) would need to be completed.  TINER did not like that an IRS Form 8300 would have to be completed, so the salesperson recommended that TINER bring a cashier's check for the purchase.  TINER returned a couple of hours later with a man named Tony Williams, who TINER said was his nephew.  Williams provided a cashier's check (dated January 29, 2019) and a photo ID and signed the paperwork to purchase a 1962 Chevrolet Impala, bearing identification number (VIN) 21869F279747.  The cashier's check was in the amount of $49,829.94 and was issued by PNC bank and was payable to Gateway Auto Sales.  After the transaction was completed, TINER left and again returned a couple of hours later and stated that he no longer wanted the purchase in his nephew's name, but rather his son's name (Justin Tiner). The paperwork was re-done listing Justin Tiner as the purchaser/owner of the Impala.

54. Because TINER originally wanted to purchase the vehicle in his name, but changed his mind after learning that would trigger the filing of a Form 8300 in his name, and the name of the purchaser was changed from Tony Williams to TINER's son at TINER's direction, it appears

that TINER was the source of the funds used to purchase the 1962 Chevrolet Impala and the *de facto* purchaser of the vehicle.

55.     The cashier's check used to purchase the 1962 Chevrolet Impala was purchased with cash.  PNC Bank filed a Currency Transaction Report ("CTR") regarding this transaction with the United States Department of the Treasury.  This CTR indicates that on January 29, 2019, a person named Tony Williams, Jr., purchased a negotiable instrument in the amount of $49,830 for cash.

56.     Based upon the investigation, it appears that the likely source of $49,830 in cash available to TINER in January 2019, was the Fraud and Extortion he committed against RG.

57.     On August 30, 2018, TINER signed a home service program financial data sheet on which he stated he had no assets.  On that same form, TINER stated that his only income was $1447 in Social Security Disability Insurance payments.

58.     TINER had no known legitimate employment during 2018 and January 2019.

59.     A Forensic Accountant employed by the FBI has examined the records for all bank accounts known to have been registered to TINER and Matissia Holt.  The Forensic Accountant determined that during 2018 and January 2019, these accounts did not have sufficient funds from legitimate sources to pay for the purchase of a $49,829.94 cashier's check.

## **CRIMINAL INDICTMENT**

60.     On November 18, 2020, a federal grand jury sitting in East St. Louis, Illinois, returned an 54 count indictment charging TINER with the following offenses:  Extortion (18 U.S.C. § 1951); Interstate Communications with Intent to Extort (18 U.S.C. § 875(b); Wire Fraud (18 U.S.C. § 1343); Mail Fraud (18 U.S.C. § 1341); Health Care Fraud (18 U.S.C. § 1347); Money Laundering (18 U.S.C. § 1956(a)(1)(b)(i)); Conducting Monetary Transactions in Criminally

Derived Proceeds (18 U.S.C. § 1957); Aggravated Identity Theft (18 U.S.C. § 1028A); Material Misstatement of Fact to a Domestic Financial Institution (31 U.S.C. § 5324(a)(2)); Use of a Social Security Number of Another Person in Violation of the Law (42 U.S.C. § 408(a)(8)); and False Representation of a Social Security number (42 U.S.C. § 408(a)(7)(B). The indictment also charges Matissia Holt in several of the Health Care Fraud, Money Laundering, and Monetary Transaction counts. In addition, the indictment seeks forfeiture of various properties and cash amounts.

## **CONCLUSION**

61. Based on the foregoing, your Affiant has probable cause to believe that the following property constitutes or was purchased with funds constituting or derived from proceeds of violations of Title 18, United States Code, Sections 1341 (Mail Fraud); Title 18, United States Code, Section 1951 (Extortion); Title 18, United States Code, Section 1956 (Money Laundering); and Title 18, United States Code, Section 1957 (Monetary Transaction in Criminally Derived Property) and is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) and 18 U.S.C. § 981(a)(1)(C):

- a. One 2020 Ford F350 Crew Cab XLT, VIN: 1FT8W3B64LEC41202, with all accessories, attachments, and components thereon;

- b. One 2019 Cadillac Escalade, VIN: 1GYS4KKJ7KR254957, with all accessories, attachments, and components thereon;

- c. One 1962 Chevrolet Impala, bearing identification number (VIN) 21869F279747, with all accessories, attachments, and components thereon;

- d. $59,624.20 in United States funds seized from Regions Bank account xxxxx4577 in the name of Matissia Holt; and

- e. $17,065.66 in United States funds seized from Scott Credit Union account xxx8198 in the name of Matissia Holt.

Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 5th day of May, 2021.

*Adam Hoberg*
Adam Hoberg
Special Agent
Federal Bureau of Investigation